ALEXANDER et al. v. ALEXANDER, Appellant.

Division One, June 14, 1899.

1. **Contract**: PAROL AGREEMENT TO CONVEY LAND: PART PERFORM-
ANCE. A parol contract, based on a valuable consideration, having
been executed by part performance, so that a refusal to complete it
would work a fraud on the opposite party, is not within the statute
of frauds, and a court of equity is justified in enforcing its specific
performance.

2. ———: ———: ———: EVIDENCE. But a court of equity must be
well satisfied of the existence and character of the agreement, and
the acts done by the parties should be clear and definite and refer-
able exclusively to the contract.

3. ———: ———: ———: ———: CASE STATED. The answer in
ejectment, alleged that defendant's deceased brother in his lifetime,
made a parol agreement with him, whereby for valuable considera-
tion, promised, agreed and performed, all the property of which said
brother should die seized should upon his death pass to and vest in
defendant, and that said deceased would execute necessary wills and
conveyances to carry into effect said contract. *Held*, that the oral
and written evidence, which is set out in the opinion, clearly
establishes such contract, and definitely and unmistakably shows
that, in consideration of a release by defendant to deceased for life
of his interest in his mother's land and of other land which deceased
had bought partly with money furnished him by defendant, the
lands were to be used, occupied, enjoyed and disposed of by de-
ceased so long as he lived, and that they or their proceeds should
become the property of defendant at deceased's death. *Held*, also,
that this performed contract, clearly and definitely established,
authorizes this court to reverse the judgment of the trial court, and
to decree that defendant should take such lands to the exclusion of
deceased's brothers and sisters of the half blood.

*Appeal from Saline Circuit Court.*—HON. RICHARD
FIELD, Judge.

REVERSED AND REMANDED (*with directions*).

W. M. WILLIAMS for appellant.

(1) "It is the settled law of this State that an agreement to dispose of property by will in a particular way, if made upon sufficient consideration, is valid and binding, and that, although the contract be oral, the part performance of it will take it out of the operation of the statute of frauds, when a refusal to complete it would work a fraud on the other party." Fuchs v. Fuchs, 48 Mo. App. 23; Gupton v. Gupton, 47 Mo. 37; Wright v. Tinsley, 30 Mo. 389; Sutton v. Hayden, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647; Nowack v. Burger, 133 Mo. 24; Parcell v. Stryker, 41 N. Y. 480; Neale v. Neale, 9 Wall. 1. (2) It necessarily follows that if such verbal contract can be specifically in favor of one who has fully performed his part thereof, the agreement may be proven by oral testimony. The declarations of John H. Alexander, deceased, and his letters are competent evidence for that purpose. It is not necessary in such cases that a formal, written contract, containing all the terms of the agreement, should appear, in order to authorize equitable relief. Nowack v. Burger, 133 Mo. 24; Sutton v. Hayden, 62 Mo. 101. (3) Defendant had advanced money to the deceased, which was used in paying for the land. He came to Missouri for a settlement. His brother did not want to divide the land or settle up their affairs at that time. Defendant's promise, acted upon by both parties, not to require a division of the land, and not to demand a settlement or repayment of his money, was a sufficient consideration to uphold and support the agreement. 6 Am. and Eng. Ency. of Law (2 Ed.), 747. (4) It was not necessary that the contract should describe the particular property, or the manner in which it should be transferred to the defendant. It is sufficient for defendant to show that the agreement was that all the property of the deceased should become his. Sutton v. Hayden, 62 Mo. 101; Nowack v. Burger, 133 Mo. 24. (5) The statute of frauds constitutes

no barrier to a decree in defendant's favor.    The contract was fully performed on his part.    "It is a rule in equity that when one party to a contract has been placed in such a situation, by a total or partial performance, that it would be a fraud on him if the contract was not fully executed, then equity will interfere, notwithstanding the statute."    Nowack v. Burger, 133 Mo. 24; Sutton v. Hayden, 62 Mo. 103; Mitchell v. Colby, 63 N. Y. 769; Leahey v. Leahey, 11 Mo. App. 413; Farrar v. Patton, 20 Mo. 81; Dickerson v. Cristman, 28 Mo. 134; Carmeichel v. Carmeichel, 1 L. A. R. 596; Kominsky v. Kominsky, 21 N. Y. Sup. 611.

J. F. RUTHERFORD and WM. S. SHIRK for respondents.

(1)    Defendant's answer in the nature of a cross-bill for equitable relief, alleges a contract between the deceased and defendant, made in May, 1876, that, if defendant would not require deceased to repay $896, loaned him to pay in part for eighty acres of land bought by deceased, that when deceased died, all his property should go to defendant.    In this court defendant abandons this theory of the contract, as we understand it, and now relies upon a contract to the effect, that defendant in 1876, called upon deceased for a division of the land that deceased had bought and partly paid for with defendant's money, and that deceased then agreed, that if he would not call for a division, it should all belong to defendant at deceased's death.    This constitutes a clear case of setting up one cause of action in the trial court, and then attempting for the first time in this court, to recover upon a different cause.    Such conduct will not be tolerated in this court. Minton v. Steele, 125 Mo. 181; Randolph v. Frick, 57 Mo. App. 400; Harper v. Morse, 114 Mo. 317; Tomlinson v. Ellison, 104 Mo. 105; Blackwell v. Smith, 8 Mo. App. 43; Harwood v. Toms, 130 Mo. 225; Gray v. Worst, 129 Mo. 122. (2)    In defendant's answer he alleges a contract to convey or devise by will without saying whether it was a verbal or

written contract, the presumption in such case being that it was a written contract. And to prove such written contract a mass of letters were introduced in evidence, as constituting such written contract. These letters do not in any legal sense constitute such contract, nor any memorandum thereof, for the following reasons: First. None of said letters, nor all of them taken together, undertake to state the whole agreement. Rucker v. Harrington, 52 Mo. App. 481. Second. Nor do they contain any good or sufficient description of the land to be conveyed. Fox v. Courtney, 111 Mo. 147; Cunningham v. Williams, 43 Mo. App. 629; Vanstone v. Hopkins, 49 Mo. App. 386. Third. Where the letters speak of "the land" or "the farm"—it can not be told whether he means the fifty-three and one-third acres belonging to the mother, or his own eighty acres. Fourth. The letters do not, on their face, purport to constitute a contract or a memorandum of one. At most they contain, in a vague way, reference to something that deceased had agreed to in the past. This is not sufficient. Ringer v. Holtzclaw, 112 Mo. 519; Weil v. Willard, 55 Mo. App. 376; Boyd v. Paul, 125 Mo. 9. (3) An agreement to make a will, devising real estate, is as much within the statute of frauds, as an agreement to convey by deed. Brown on Statute of Frauds, sec. 263; Gupton v. Gupton, 47 Mo. 37; Sharkey v. McDermott, 91 Mo. 647; Hicks v. Hicks, 48 Mo. App. 18; West v. Bundy, 78 Mo. 407. (4) But appellant now takes the position that there was a verbal contract to convey by deed or will, made upon a sufficient consideration, which contract was wholly performed on appellant's part, and that it would now be a fraud upon him to refuse to decree specific performance. First. The verbal contract must be established, by competent proofs to be clear, definite and unequivocal in all its terms. Johnson v. Quarles, 46 Mo. 425; Sitton v. Shipp, 65 Mo. 297; Railroad v. McCarty, 97 Mo. 214; Berry v. Hartzell, 91 Mo. 132; Brownlee v. Fenwick, 103 Mo. 420; Rogers v. Wolfe, 104 Mo. 9.

The evidence does not even tend to establish such a contract. Second. The proof must be equally clear as to the consideration for such contract. Fuchs v. Fuchs, 48 Mo. App. 23. Third. And the acts of part performance or entire performance must be supported by evidence equally clear and forcible, that the acts performed refer to and result from such agreement, and with a direct view to its performance. There must be no equivocation or uncertainty in the case. 1 Johns Chancery, 131; Emmel v. Hayes, 102 Mo. 186; Ells v. Railroad, 51 Mo. 200; Brownlee v. Fenwick, 103 Mo. 420; Rogers v. Wolfe, 104 Mo. 9.

BRACE, P. J.—This is an action in ejectment to recover 139 acres of land in Cooper county, described in the petition, which is in common form. The answer of the defendant, after a general denial, sets up the following defense to plaintiffs' cause of action:

"And for another answer and defense to plaintiffs' petition this defendant says, that the plaintiffs' claim to the land described is by inheritance from one John H. Alexander, and not otherwise; that this defendant is the brother of the said John H. Alexander, deceased, and is the only brother or sister of said deceased of the full blood that is now surviving or that was living at the death of the said John H. Alexander, and that said deceased was never married, and that his father and mother are both dead, and that plaintiffs' claim to be his half brothers or sisters, or descendants of same, and assert title to said land by inheritance, as aforesaid, from said John H. Alexander, and in no other manner.

"Defendant further states, that the father and mother of the said deceased and this defendant separated, and ceased to live together as man and wife, in about the year 1844; and that by an agreement between them, the custody and control of the defendant and the said John H. Alexander, deceased, was given to their mother, Edith Alexander; and said boys,

together with two daughters of the same marriage, were brought to Cooper county, Missouri; and the said Edith Alexander purchased, partly upon credit, a portion of the land described in the petition, and moved thereon with her four children, to wit: The said John H. Alexander, the defendant, and their two sisters, and that they continued to reside thereon for many years; that the remainder of said land, described in the petition, was purchased by the deceased, John H. Alexander; that afterwards, it was agreed by and between the said John H. Alexander and this defendant, with the assent and concurrence of their mother, that the said John H. Alexander should remain with and care for their mother and sisters, and that this defendant should go to the State of California and work there, and that he should send home, to his said brother and mother, all of his earnings over and above the amount necessary for his support, and that the same should be used in paying for the land purchased by his mother and a part of which is described in the petition; that afterwards, it was further contracted and agreed by and between the said John H. Alexander and this defendant, that the said John H. Alexander would buy other lands, in his own name, in addition to that to which the title was then in their mother; and that this defendant would from time to time send to the said John H. Alexander money to assist him in paying for the land so purchased; and that the lands described in the petition were purchased and held by the said John H. Alexander, under said contract and agreement, and were paid for, in part, by money furnished to them by this defendant; that the total amount of money sent by this defendant to be invested in, and which was invested in the lands described in the petition, amounted to the sum of $896; that the said John H. Alexander offered to convey to this defendant an undivided half interest in said lands in consideration of the money belonging to the defendant which had been used in paying therefor; that the defendant declined said offer; that the sisters, born of the

marriage between the father and mother of said John H. Alexander, were then dead, and that only the said John H. Alexander and this defendant remained alive; that said John H. Alexander was single and unmarried; that neither the said deceased nor this defendant had ever any knowledge of, or intercourse with any of their half-brothers and sisters after the separation between their father and mother, as aforesaid; that in view of these facts and for and in consideration of the said sum of $896, advanced by this defendant to the said John H. Alexander to be used in paying for said lands as aforesaid, and in consideration of the promise then and there made by this defendant to the said John H. Alexander not to require him, the said John H. Alexander, to repay the defendant the said sum of $896, advanced as aforesaid, it was then and there, to wit, in May, 1876, contracted and agreed by and between the said John H. Alexander and this defendant, that all the property of which the said John H. Alexander should die seized, should upon his death pass to and vest in this defendant, and that said deceased would execute necessary wills and conveyances to carry into effect said contract; that in consideration of said contract upon the part of the said John H. Alexander, and relying thereon, this defendant permitted the said John H. Alexander, to retain the title of the whole of said land, and took no step, whatever, to collect from him said $896, or any part thereof; that the said John H. Alexander died in the county of Cooper, in the year of 1894, without having made a will and without having conveyed the lands described in the petition to the defendant, as he was in duty bound to do under his said contract; that the said John H. Alexander failed to provide, by will, that said property should belong to this defendant, as he had promised and agreed to do in the contract aforesaid, because of his belief that this defendant would be his sole and only heir, and for no other reason.

"Wherefore, the defendant prays that said contract be specifically enforced, and that the legal and equitable title to the lands described in the petition be vested in this defendant, and for all proper relief."

Issue was joined upon the new matter set up in the answer by reply, which also contained a plea of the statute of frauds. The case was taken by change of venue from the Cooper to the Saline county circuit court, where it was tried by the court without a jury, the issues found for the plaintiffs, and judgment rendered in their favor for the undivided twenty twenty-sevenths of the premises, and the defendant appeals.

John H. Alexander, deceased, is the common source of title. He died in 1894, seized in fee of the premises under the following chain of title:

Deed, dated January 23, 1846, from James Thomas and wife to Edith P. Alexander, for 13 acres of the land in controversy, in consideration of the sum of $60, paid by her to the grantors.

Deed from William Cartner and wife to Edith P. Alexander, for 40 acres of said land, dated October 7, 1850, consideration $190.

Deed from John Allison and wife to John H. Alexander for 80 acres of said land, dated June 8, 1860, consideration $1,000.

Deed from Jas. H. Rennison and wife to John H. Alexander, for 5 1-2 acres, acknowledged January 2, 1882, consideration $165. On the 30th of October, 1887, Edith P. Alexander died leaving surviving her, as her only heirs at law, her two sons the said John H. Alexander and the defendant.

Deed from Isham E. Alexander and wife to John H. Alexander, conveying all of defendant's interest in the 53 acres of land belonging to Edith P. Alexander, and his interest in the personal property of his mother's estate, dated May 25, 1888. Consideration $802.50.

The defendant is his brother of the whole blood. The plaintiffs are the half brothers and sisters, and the descendants of other deceased half brothers and sisters, of the said John H. Alexander, deceased, and the judgment in their favor on the legal title is correct unless the defendant, the only brother of the whole blood of said deceased, in possession of the premises at the time suit was brought, has made good the claim set up in his answer by competent and sufficient evidence, and this is the only question in the case.

It appears from the evidence that prior to the 9th day of December, 1844, Reuben and Edith Alexander were husband and wife, living in Boone county, Missouri, and having three children born of the marriage, to wit, the said John H. Alexander, deceased, the defendant Isham E. Alexander, and a daughter named Sarah. That on that day they were legally divorced. That a short time thereafter another daughter was born named Susie. That at some time between the 9th of December, 1844, and the 23d of January, 1846, she, with her two little daughters, removed from Boone to Cooper county and purchased the 13 acres of timber land before mentioned, for which she received the deed of date January 23, 1846, about which time also she effected a settlement with her late husband by which she obtained the custody of her two sons, and received from him, with them, the sum of $500, and by the assistance of the neighbors succeeded in getting a clearing made and a log cabin erected on her little tract of land. Thus it was that in the beginning of the year 1846, this brave woman commenced her new life in this humble home in the woods, with her four little children, one of whom, John H., was to some extent an invalid, afflicted with a disease called "the white swelling." He was the oldest, and was then probably about 16 years old. Isham was two or three years younger; the sister, Sarah, still younger, and the baby, Susie, who died in infancy. Mrs. Frazier, an old lady who was the last of her cotemporary neighbors, testified that she was a

"very enterprising and energetic lady," "very saving and industrious," "worked until eleven and twelve o'clock at night on her loom. Everybody gave her work, and tried to help her along all we could." As a result of her industry and management, assisted, doubtless, to the extent of their powers, by her affectionate children, she was enabled to surround herself and family, on a small scale, with the ordinary comforts and conveniences of farm life of that day, and within four or five years purchased an additional 40 acres of land, for which she received her deed, dated October 7th, 1850, constituting with the 13 acres which she then owned, the fifty-three-acre tract of which she died seized. About the year 1850 the defendant Isham, then grown to be a stout boy about 17 or 18 years of age, went to California. In the meantime, Reuben Alexander, who was a widower with children by a former marriage when she married him, had married again, and in 1853 moved to Buchanan county, where he seems to have died in 1872 or 1873, leaving children by both his first and third wives, who, with the descendants of some dead, are the plaintiffs in this suit. The evidence tends to show that from 1846 to the bringing of this suit, nearly 50 years afterwards, the two families were as strangers to each other.

After Isham went to California, his mother and his brother John, and their sister, continued to remain on the little farm as before, until 1860, when John purchased the 80 acres for which he received his deed of June 8, 1860, and thereafter they continued so to live during the war; the family being supported and maintained during the time, in the language of Mrs. Frazier, by "herself and her own exertions, and her children at home, and this young man here in California sent his mother money every once in a while, I don't know how much, but I heard of him sending money to her during the war. She would get money from Isham to help her out."

During this time John, although lame as a result of his

disease, had developed into an industrious, thrifty man, and was accumulating some property in his own name, besides the 80-acre tract aforesaid. He remained a bachelor all his life, living with his mother and sister until they died, affectionately devoted to them, and maintaining cordial fraternal relations with his brother Isham, to whom he was equally devoted. From two letters written by John to Isham during this period and given in evidence, the following extracts bear upon the issue:

"Boonville, Mo., August 21, 1864.

"Dear Brother—I received your letter of July 16th, a few days ago, containing a gold draft. Many, many thanks for it. I got it changed into greenbacks. Got $266 for it. Will pay it on my land. Don't know what I would have done without it. You didn't say whether you would take half interest in the land or not. *I paid the money you sent mother on my land. This makes $400. Mother says I ought to make you a deed to half interest in the land. I will do so any time you want it. There is work enough on the farm for both of us and we all want you to come home.* Mother and sister are both awful anxious to have you come. We have had a great deal of sickness here this summer. . . . We are all pretty well except mother, she is complaining some. Sister is teaching school again; we had a letter from her; she is well. All join in sending love and best wishes.

"Your brother, J. H. Alexander."

"May 19th, 1875.

"Dear Brother—I received your letter of April 14th three days ago and was glad to here that you were as well as usual. It found us only tolerably well. I have been quite unwell all spring and mother had been failing fast since last fall. She is never right well any day, and is suffering with the tetry in her eyes. *Mother says for you to come home if you want to see her, for she thinks she won't live long, and I am afraid its so. I think you can do as well here as in California—at least we*

*can make a living and all be together.* . . . I sent sister's picture to you some time in April. I had it copied. It is not quite as good as the original. I was afraid to send the original, afraid it would get lost.

"I am going to town to-morrow for a 50-dollar set of grave stones for sister's grave, they are very neat. It had a Bible open, and a verse engraved on it, 'Blessed are they who die in the Lord.'

"I am excusable this time for not answering your letter sooner, for I did not receive it until three days ago. You said that you had written three letters since you had received any; I never got them. Answer soon and come home. Mother's and my love, hoping we will see you soon,

Your Brother,        J. H. Alexander."

It appears from these letters that before the last one was written, May 19th, 1875, the sister had died and the mother's health was declining, and from the evidence, that sometime in the year 1876, Isham visited his mother and his brother John in Missouri, and sometime after his return to California from that visit, married and continued to reside in that State. That about the first of the year 1884 his wife and daughter visited John and his mother in Missouri. Upon their return to California, and in answer to a letter from her, John wrote the following letter, omitting immaterial parts:

"Boonville, Mo., Feb. 10th, 1884.

"Dear Sister, Brother and Chick—I should have written ere this if it had not been raining, sleeting or snowing every day since I received your letter yesterday one week, and is sleeting and raining to-night. . . . *Sister, You speak of my kind favor and your obligation to me. Now I don't you to mention that, for I am under many times more obligation to brother for money sent me when in sore need and I have promised and expect to repay it all some day. I want you all to remember that you promised to come home inside of three years. I will try to have things more comfortable by*

*that time.* I would come and see you all but you know that I can't leave mother. If brother was here I could go more. Thanks for your kind offer to make my shirt, but one of my neighbors has taken it to make. Don't expect it to be as nice as the one you made, for that is the nicest I ever had. I will let you make them when I come to live with you *That is if I don't take a fool notion to get married, but, oh, I forgot that I promised brother I would not marry.* Peaches, cherries and blackberries are all killed, the apples we can't tell yet. Mother and brother, love to all.

"J. H. Alexander."

In the meantime John had bought the 5 1-2 acres for which he had received his deed dated January 2, 1882, and as before stated, on the 30th of October, 1887, Mrs. Edith P. Alexander, the mother, died, and on the 9th of November, 1887, John wrote as follows:

"November 9th, 1887.

"Dear Sister and Niece—I should have written before this but have not gained strength as fast as I expected and have just applied for letters of administration and will have them next week and be ready for business. I consulted a lawyer and also the probate judge and they both told me that it was not necessary, if I thought I have no difficulty in collecting the notes, but if Greenalgh refused to pay I could not make him pay, so I have administered and will demand the money or bankable notes.  .  .  .  I will write soon and let brother know what I have done or can do. *I intend to collect the notes and send him the money if it can be done legally, for I don't want to keep the money any longer than I can help.* Your loving Brother,

"J. H. Alexander."

And on the 16th day of December, 1887, in a letter of that date he wrote as follows:

"Boonville, Mo., Dec. 16th, 1887.

"Dear Brother, Sister and Babies—I received yours of November 27th three days ago. . . . *Can't you fix matters so that you can come home in the spring so we can fix up things. Then you could see about the Greenalgh money yourself, and we could settle up our other affairs, too. Of course I don't want to divide the land, but I am willing to share it with you now, and leave it to you as I agreed to when I die and I often think that won't be long.* Mother always said that I wouldn't live a year after she died. Well, little Chicks Grand Ma is no more, but she remembered last summer your Christmas and laid it bye and said I was to send it if she did not live until then. So here is the last Christmas dinner Grand Ma will send to you all, twenty dollars. Love to all, although our Christmas will be spent in sorrow."

On the 25th of May, 1888, as we have heretofore seen, Isham by deed of that date, in which his wife joined, conveyed all his interest in the personal estate of his mother and in the 53 acres of which she died seized, to John.

On the 2d of June, 1888, John remitted to Isham a draft on New York for $500, and on the 7th of July, 1888, another draft on New York for the same amount.

On the 9th of January, 1891, in a letter to his brother Isham and family, John wrote: . . . "I had to be at court on December 18th to settle Mother's estate, which took a long time and expense for nothing, just because the law said so. It's settled and off my mind now. John Greenalgh has done nothing yet. He offers to take $30 per acre for the home place and it ought to sell for that, for it is one of the best farms in the county. This is $1200 first mortgage which is ahead of your money, but I think it will come some day. You want me to come to California and say I can live easier than here. That may be so, if I had plenty of money to live on, but I am

old to move around now, besides *we can't sell this place. I have been thinking lately that you had better come back here. I haven't forgot my promise when you were here. Why not come back now and help fix up the place, so we can all be together? I don't believe that you are getting rich there.* This has been a hard year on farmers here and all kinds of stock are low but we have plenty to eat. Write soon. Love to all."

And on November 11th, 1891, in a letter of that date he wrote: *"I want to sell out to come to join you and take a rest, for I think I have worked hard long enough. One thing keeps me from selling is the poor house, and it won't pay to build. We can't get payed for the improvement other ways. The farm is in good shape.* Greenalgh is here now trying to sell his home farm; if he sells you will get part of your money. The first mortgage will have to be paid first. How much I can get for you I don't know. Henry Crawford is talking of buying the farm and is trying hard to get me in with him, but I don't intend to go in debt again. It won't do. I think it is best to take what we can get and wait for the balance, if there be any. I am getting very anxious to have this thing settled and off my hands. I think he owes about two thousand five hundred. I think I can get $1,000 cash out of it, and the remainder in Bates county land. I want to get it off my mind some way."

And on the 8th of December, 1893, in a letter of that date, he wrote:

"Boonville, Mo., Dec. 8th, 1893.

"Dear Brother, Sister and Children—I have just received yours of November 26th, saying that you had not heard from me for a long time. I wrote to Allie in September. Received letters from each of the children a few weeks ago. Am very glad to see they write so well. Will write them soon. I want them to write often, for I am always anxious to hear from you all, although I am very slow in answering. In fact it is very hard work for me to write, it is a great deal easier to

maul rails.   My health has not been good  this  fall.   I  have had chills, rheumatism  and  colds,  though  able to be up and work some all the time.   *I wish you would come back here on the farm.   There are only two of us left.   You could do just as well here.   My health is poor and if anything happens to me all I have here will be yours.*"    .   .   .

On the 5th of February, 1894, John died, and soon thereafter Isham went into possession of the premises and this suit was brought.   Some additional light is thrown upon the story by the declarations of John, as shown by the following extracts from the parol evidence.

Captain Keiser testified:

"I was in Boonville one day and he told me he  had  just sent Isham five hundred dollars of his money.

"Q.   Did he tell what he sent that for—of whose money? A.   *Isham's money.   He said that it was money that was sent to him; that Isham sent them money. during the war, and that she did not need it; that she had put this money out at interest and it had accumulated and that he (Isham) was in trouble and they needed it.*   Q.   Isham was in trouble?   A.   Yes, sir. Q.   And needed his money?   A.   Yes, sir."   Being interrogated in regard to  other  conversations ·he  answered:   "Yes, sir, when I would·be out  there  at his home.   I  don't  know exactly when it was, but it was between 1865 and 1879 though, he had told me several times *that Isham had sent them money time and again.*   Q.   Did John tell you how they had used the money that Isham had sent?   A.   *To pay for this land.*" He further testified to a  conversation  he  had  with  John  in 1893, the year before John died, as follows:

"Q.   Well, tell what he said?   A.   I was waiting for a wagon and he came along and I got  in  his wagon and rode to town with him, and I was joking him about getting married, or something of that kind; and he said, 'I never expect to marry,' or something of that kind; in fact, he said:   'I can't marry, I have nothing to marry on.'   I says, 'Where is your farm?'

and he says, 'Well, that don't belong to me, *I agreed to give that to Isham.'* And I says, 'When did you agree to do that?' 'Well,' he says, 'In 1876, when Isham was here to settle up the estate.' I says, 'How come you to agree to that?' and he says, *'Isham had furnished them money during the war and also money to help pay for the land, and he came here in 1876 and called for a division, and I told him if he would not divide it that it would all be his when I died and that I would leave it to him.'"*

"Q. Did he tell you, in that conversation, how much money Isham had sent to him to help pay up on that land? A. No, sir. Q. He did not tell you any amount? A. *No, sir, he said that he had sent money time and again to assist in paying for that land."* And on cross-examination he testified, "He told me that Isham came here for a settlement. Q. About his mother's estate? A. About his mother's estate, and he told him *that if he would not settle it, and let it go as it is, he would leave all he had to him when he died. . . . He said: 'I agreed to give it to him if he would not call for a division and just let it go as it was,' and that was the way I understood it."*

Mr. Cooper, another witness, testified to a conversation he had with John about the time Isham got into trouble, and to subsequent conversations, as follows:

"I met him on the street in Boonville, and asked him how Isham was financially and if he needed any help, and he said, 'No, sir, I have just sent him some money;' he did not say whether it was that day or what day it was, but it was about that time. I had just heard about it a few days before that, and that was why I asked him the question, and I told him, I says, I suppose now that you will let us know something to that effect if Isham needs any help, and he says it does not matter about that, *he has plenty without it here,* was the remark he made. I believe that was about all. There was some one come up and interfered with our conversation and

that was about all I said to him in that conversation. Later on—it was at the time I was loading a sheep into the wagon, and I had bought a sheep from him, and I was teasing him about not marrying, and he says, 'No, I will never marry, George, I don't care to marry, I am getting old,' and I says, 'What are you going to do with this property here if you ain't going to marry?' And he says, *That will be Isham's with an agreement. I have promised to leave that to Isham'. . . .* And the next time I had anything to say with him was there, after his mother had died, and I was there after poultry, and my wife was with me, and she brought the conversation up herself as to him marrying, and he made the remark and says that he never intended to marry. She asked him the question, rather, why he did not marry and fix up the place, and not live there like he was—he was 'keeping bach,' and she went in and was helping him to prepare some dinner, is how the conversation came up. And he just simply says, 'I don't expect to marry, and I don't want to fix it up, and *I don't want to fix up this property because it is Isham's.*' "

Mr. Reid, another old citizen of Cooper county, testified to a conversation he had with John a short time after the visit of Isham's wife and child to him in 1884, as follows:

"I was rather joking John once and telling him, I says, 'John (it is here in evidence that he was crippled and very lame and a very hard-working boy, or man, and I thought he was really working too hard, and I says)—'John, without you intend to marry, why are you working yourself to death here? You have got enough, it seems to me, to live better than you do,' and he says, 'I never intend to marry. I have no idea of it,' but he says, *'Isham has a daughter, and I expect him to get what I have got, and that child.'* " . . .

(1) The cause of action set up in the answer upon which the defendant predicates his prayer for the relief therein sought, is in substance an alleged contract made between him, and his brother, John H. Alexander, in his life-

time, whereby the said John H. for valuable considerations, promised and agreed "that all the property of which the said John H. Alexander should die seized, should upon his death pass to and vest in this defendant, and that said deceased would execute necessary wills and conveyances to carry into effect said contract." Which contract, the defendant avers, he relied upon, and fully executed upon his part. The answer has been set out in full, showing the alleged inducement, and consideration for such promise. That such a contract, although oral, if executed by part performance, so that a refusal or failure to complete it would work a fraud on the other party, is not within the statute of frauds and affords good ground for the interposition of a court of equity to enforce its specific performance, is well settled law in this State. [Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Hiatt v. Williams, 72 Mo. 214; Sharkey v. McDermott, 91 Mo. 647; Nowack v. Berger, 133 Mo. 24, Fuchs v. Fuchs, 48 Mo. App. 18.] But as was said by NAP-TON, J., in Sitton v. Shipp, 65 Mo. 297: "Courts of equity, when called on to decree a specific performance of an alleged parol agreement, are asked to exercise an extraordinary jurisdiction. They must be well satisfied of the existence and character of the agreement, and will always look to the substantial justice of the case. They must be satisfied that any resistance to the completion of the agreement alleged and proved, would operate as a fraud on the other party." And when as in this case a party seeks to take his cause out of the statute of frauds by showing performance of the alleged agreement on his part, in the language of Judge STORY (Eq. Jur., 13 Ed., sec. 764), which has been frequently sanctioned and approved by this court, "it is not only indispensable that the acts done should be clear and definite, and referable exclusively to the contract; but the contract should also be established by competent proofs to be clear, definite and unequivocal in all its terms." [Rogers v. Wolfe, 104 Mo. 1, and authorities cited;

Brownlee v. Fenwick, 103 Mo. 420; Cherbonnier v. Cherbonnier, 108 Mo. 252.] The competent evidence by which a parol contract is to be proven, must necessarily be by parol, either oral or written or both, and that in this case it may appear upon the face thereof, without comment, whether the alleged contract has been proven so as to satisfy the requirement of these principles, the material evidence has been carefully set out at length in its natural and chronological order with the salient features thereof emphasized by italics.    There is no conflict in that evidence.    There is no question about the character, qualifications or credibility of the witness.    There is nothing in the character of the evidence or the circumstances under which it was delivered to induce the belief that the learned chancellor below was in any better position to properly weigh it than we are, and as the only question is as to the proper deductions to be drawn therefrom, upon us is now devolved the responsibility of determining its sufficiency to sustain the defendant's claims; a responsibility from which we are not relieved by his conclusions. [Dalrymple v. Craig, 149 Mo. 345.] With a due and proper sense of that responsibility, and after mature consideration of all the evidence and circumstances of the case, the conclusion is irresistibly impressed upon our minds and consciences that there was a distinct and well defined agreement and understanding between these two brothers that the lands in question were to be the property of John, to be used, occupied, enjoyed and disposed of by him as he might see proper, so long as he lived, but that they or their proceeds should become the property of Isham when John died.    Every word in the evidence, and every act of the parties, is not only consistent with this idea, but inconsistent with any other conclusion, and such an agreement is not only a key and solution to everything that was said and done by and between these two brothers in regard to this property from the beginning to the end, but upon no other theory can their conduct for nearly a quarter of a century be reasonably explained.

That there was an agreement is certain. That the subject-matter of the agreement was definite and certain there can be no doubt; it was the little home carved out of the wilderness by the joint labor of the mother and her two sons, with the addition thereto by purchase made with the means furnished by the sons. In the eyes of that mother and of each other, they were to be joint owners of that home at her death; and running through the correspondence with the absent one, we have the constant refrain come home—our home—your home. In expectancy Isham had an equal interest with John in the original tract of 53 acres, and an equitable interest in the remainder proportionate to the amount he contributed to the purchase money therefor, and a relinquishment of his right to claim his interest during the life of John was a valuable and adequate consideration for a corresponding promise on the part of John to leave the property to his brother at his death. That contract was faithfully executed and carried out by Isham. His brother John was not only permitted to enjoy the property during the whole of his life undisturbed by any claim on the part of the defendant, but within a short time after the death of the mother, Isham by deed duly executed, conveyed his equal undivided half in fee of the original homestead of 53 acres to his brother. Thus divesting himself of all apparent title to the premises, and hanging all the interest he had in this hard-earned patrimony upon his brother's promise, which for some unexplained reason was not performed as he had a right to expect it would be by the execution of a proper will devising the premises to him. The evidence in this case shows that these brothers had the most implicit confidence in each other, founded upon a life of devoted and unbroken fraternal affection for each other. And to refuse to execute this contract now, would be to stultify their whole lives, impugn the memory of the dead, whose life so far as can be seen in the evidence was without reproach; deprive the defendant of the

just fruits of a contract upon which he relied, and fully executed, at the instance of those "who would reap where they have not sown." About the justice of the case there can be but one opinion. All the equities are on the side of the defendant, and as the evidence discloses as fair, clear and definite a contract as could be expected under the circumstances, fully performed upon the part of the defendant, and as it would be a fraud upon him not to execute it; the case is brought within those equitable principles to which we have adverted, and entitles him to the relief sought. The judgment of the circuit court will therefore be reversed and the cause remanded with directions to enter a decree in favor of the defendant as prayed for. All concur.