Ex parte VIRGIL HELTON, Petitioner.

St. Louis Court of Appeals, March 13, 1906.

(Opinion by Bland, P. J.)

1. HUNTING LICENSE. The several sections of the act ap-
proved March 10, 1905, relating to the propagation and pres-
ervation of game (Laws of 1905, pages 160 to 169), leaving
out of consideration section 54 of the act, indicate that the
Legislature intended that all hunters, except owners and ten-
ants hunting on their own lands, should take out a license, and
to make it a misdemeanor to hunt without a license whether
in one's own county or outside.

2. ———: Statutory Construction. In construing a new statute
of doubtful meaning, the official journals of the Legislature

117 App.—39

may be resorted to, and amendments to the original bill, shown therein, examined for the purpose of ascertaining the intention of the Legislature.

3. ———: ———: Hunting in One's Own County: Legislative Intent. The House journal of the State Legislature shows that an amendment to section 54 of the Act of 1905 relating to the propagation and preservation of game and fish was amended in its progress through the House by the insertion of the words "outside of the county in which he lives," and this shows an intent on the part of the Legislature not to make it unlawful for one to hunt without a license in the county in which he resides.

4. ———: ———: ———: Strict Construction. The statute requiring a license to be taken out for the purpose of hunting, being a penal one, should be construed strictly and a strict construction would give an effect to section 54 of the act not requiring a license to hunt in the county of one's residence.

(Separate Opinion by Goode, J.)

5. ———: ———: ———: ———. It does not plainly appear from the language of the Act of 1905 that the Legislature intended to make it an offense for a person to hunt in the county of his residence without a license, and for that reason it should not be made to apply to such county, under the rule that criminal statutes should be strictly construed.

Original Proceeding by Habeas Corpus.

PRISONER DISCHARGED.

*John G. Cable* for petitioner.

(1) A statute should be so construed that effect will be given to all of its provisions. Bank v. Ripley, 161 Mo. 126, 61 S. W. 587. (2) When a literal construction of any section would conflict with any other section of a statute or with the scope and manifest intent of the act, it is the duty of the court, if possible, to harmonize the various provisions and, if necessary, to depart from a literal construction of one or more sections. State ex rel. v. Heman, 70 Mo. 441. All parts of a law must be considered in getting at full significance of any part of it. State ex rel. v. County Court, 128 Mo.

427, 30 S. W. 103, 31 S. W. 23. Effect must be given, if possible, to all of its provisions. Riddick v. Walsh, 15 Mo. 519. All the words of a statute must have effect rather than that any part should perish by construction. St. Louis v. Lane, 110 Mo. 254, 19 S. W. 533. (3) When it is plain that a particular intention was in the mind of the Legislature, though not precisely expressed, that intention must govern and control the strict letter of the law. State v. King, 44 Mo. 283. (4) The court if possible, should construe a statute so as to avoid conflict between the various sections. Westport v. Jackson, 69 Mo. App. 148. (5) Habeas corpus will lie and is the proper remedy where the prisoner is imprisoned without authority of law, or for an act that is not an offense under the law. Ex parte Neet, 157 Mo. 527, 57 S. W. 1025; in re Flukes, 157 Mo. 125, 57 S. W. 545.

*C. C. Kelly* and *Barnett & Barnett* for State.

(1) It is the familiar rule of the construction of statutes that sections and parts of the statutes, *in pari materia,* are to be treated as if embodied in one section. St. Louis v. Howard, 119 Mo. 45, 24 S. W. 770. (2) It is another well-recognized rule of construction that if a construction be placed upon a particular part of the act which will make it conflict with other parts, then the courts will labor to find the meaning and construction which will reconcile the apparent hostile and conflicting provisions and will seek a construction that will give some meaning to each and every part of the act, so that it will all stand together and all be effective and so that no part of it will perish by construction. St. Louis v. Lane, 110 Mo. 254, 19 S. W. 533; Macke v. Byrd, 131 Mo. 682, 33 S. W. 448; State ex rel. v. Slover, 126 Mo. 652, 29 S. W. 718; Andrew County v. Schell, 135 Mo. 31, 36 S. W. 206; State v. Heath, 56 Mo. 231; State v. Heman, 70 Mo. 441; Cole v. Skrainka, 105 Mo. 303, 16 S. W. 491; Kane v. Railroad, 112 Mo. 34, 20 S. W. 532;

Bank v. Rinley, 161 Mo. 126, 61 S. W. 587. (3) The policy of the courts is to seek for a construction which will sustain the law and perpetuate the purpose which was intended by the Legislature. St. Joseph v. Landis, 54 Mo. App. 315. (4) If section 54 means what the defendant in this case claims it does, then it is in conflict, as has been urged, with the provisions of section 61, and especially with the provisions of sections 69 and 70. If it be true that section 54 conflicts with these other sections, then it (54) must be disregarded, because it is a familiar rule of construction of statutes that if there be an irreconcilable conflict or repugnance between the provisions of an act, or between the different sections thereof, the last in order will stand and the others, which cannot stand with them, go to the ground. Westport v. Jackson, 69 Mo. App. 153; Brown v. Commissioner, 21 Pa. St. 42; Herrington v. Trustee, 10 Wend. 553; 25 Am. and Eng. Ency. of Law (1 Ed.), 311. (5) Under the maxim, *expressio unius est exclusio alterius* everything else is excluded from the operation of this proviso except what is contained therein, that is, hunting is prohibited everywhere in this State without a license except in the territory described in the proviso. State v. Fisher, 119 Mo. 351, 24 S. W. 167; Brockett v. Railroad, 14 Pa. St. 241; Sutherland on Statutory Const., sec. 328; Tyson v. Britton, 6 Tex. 222; Roberts v. Yarboro, 41 Tex. 450; United States v. Dickson, 15 Peters 165.

*. J. H. Rodes, amicus curiae.*

(1) Section 61 provides the penalty for hunting without license, and upon whom and under what circumstances it is to be visited. "Sec. 61. Any person who shall hunt in this State without being at the time of such hunting, in possession of a license, as herein provided, duly issued to him or her, which license shall cover the period in which he or she shall be so hunting, or who

shall furnish to another person a license issued to him or her, shall be fined not less than $25, nor more than $100, and costs of prosecution." This section does not say or intimate that the resident of one's own county is exempt from the necessity of having a license, but expressly provides that any person who shall hunt in this State without being at the time of such hunting in possession of a license, as herein provided, duly issued to him, which license shall cover the period in which he shall be so hunting shall be fined, etc. (2) Again, the person found hunting is a resident of the State and living outside of the city of St. Louis, the term as "herein provided" likewise refers, *ex necessitate,* and by the same reasoning, to that section which provides when, where, and how such a resident shall acquire a State hunting license, which the law requires him to be in possession of at the time of such hunting, namely, as provided in section 58 of the act. The phrase, "as herein provided," refers only, and can, only, refer to sections 56, 58 and 59 of the act, and there is no escape from this contention, and therefore section 61 simply provides in unequivocal terms that any person hunting in this State shall be in possession of a State hunting license duly issued to him as provided for in said sections 56, 58 and 59. (3) Even if it were true, and the court should find and believe, that by implication, section 54 granted the right of a resident of one's own county to hunt therein without license, as contended by the defendant, then, it would be in direct conflict with the express and emphatic language and clear provisions of section 61. In this event section 54 must fall by a well-settled rule of legal construction of universal application, namely, that where there is an irreconcilable conflict and an open and defiant hostility between two sections of the same act, then the first, in numerical order, must go down and the latter prevail. Brown v. Commissioners, 21 Pa. St. 42; Harrington v. Trustees, 10 Wend. 553; 25 Am. and Eng. Ency. Law (1 Ed.), 311. (4) The court has well said

in its former opinion handed down that it is fundamental in construing any or all sections of an act, that the general purpose of the Legislature be gathered from the whole act, and that the several sections of the act should be so construed as to effectuate the purpose of the Legislature, and that any seeming contradiction or inconsistency of one section to another should be harmonized, if possible, and effect given to the provisions of each and every section, citing: Pembroke v. Huston, 180 Mo. 627, 79 S. W. 470; Macke v. Byrd, 131 Mo. 682, 33 S. W. 448; Darling v. Potts, 118 Mo. 506, 24 S. W. 461; Stump v. Hornbeck, 94 Mo. 26, 6 S. W. 356; Riddick v. Walch, 15 Mo. 519; Litson v. Smith, 68 Mo. App. 397; Westport v. Jackson, 69 Mo. App. 148.

BLAND, P. J.—On an information, filed before a justice of the peace, charging him with hunting game in his own county (Marion) the petitioner was convicted, fined twenty-five dollars and committed to jail until he should pay said fine. In his petition for discharge on writ of habeas corpus, the petitioner alleges that his conviction and imprisonment are without warrant of law. His contention is that there is no law requiring a resient of this State to take out a hunting license to hunt in the county where he resides. This brings up for construction sections 54, 57, 58, 59 and 61, of the act relating to the propagation and preservation of game and fish, approved March 10, 1905 (Laws of 1905, pp. 168, 169). Said sections are as follows:

"Sec. 54. It shall be unlawful for any person, after the passage of this act, to hunt in this State outside of the county in which he lives without first obtaining a license permitting him or her to do so. Such license shall be dated when issued and shall authorize the person named therein to hunt during that year, and then only subject to the regulations and restrictions provided by law.

"Sec. 57. County clerks and the license collector of

the city of St. Louis shall issue resident licenses under the seal of their office to all persons complying with the provisions of this act and shall sign the same and shall require the person to whom the license is issued to sign his name in the margin thereof. He shall keep a correct and complete record of all licenses issued in a book to be furnished by the State Game and Fish Warden, which record shall remain in his office and be open to the inspection of the public at all times. Such clerk and the license collector of the city of St. Louis shall retain out of the moneys received for each license issued the sum of fifteen cents which shall cover the swearing of the applicant to the affidavit herein referred to and all other services under this act, and shall pay the balance to the State Treasurer on the first day of each month, and report to the State Game and Fish Warden the number of licenses issued and the amount of money remitted to the State Treasurer on the first day of each month. Any person violating any of the provisions of this act shall be deemed guilty of a misdemeanor and upon conviction be fined not less than $25 nor more than $100 and costs of prosecution.

"Sec. 58. Any person who has been a bona fide resident of this State for six months then last past may procure a license for himself or herself by filing his (or her) affidavit with the clerk of the county where he or she resides, stating his or her name, age, place of residence, post office address, the color of his (or her) hair and eyes, and the fact of whether he or she cannot write his or her name, paying to said clerk the sum of $1 ; Provided, that this section shall not apply to owners and tenants of farm lands, who may hunt on their lands without obtaining a hunting license.

"Sec. 59. For the purpose of carrying out the provisions of this act, the license collector of the city of St. Louis shall correspond to the county clerks of the various counties of this State. Such license collector shall be provided with the necessary license blanks and

affidavit blanks and license record. He shall issue resident hunters' licenses and collect therefor a fee of $1 each, and for each license issued such license commissioner shall collect and retain for issuing the same a fee of fifteen cents. He shall keep such records relating to licenses issued and make such reports to the State Game and Fish Warden concerning the same as the provisions of this act required of county clerks.

"Sec. 61. Any person who shall hunt in this (State) without being at the time of such hunting in possession of a license, as herein provided, duly issued to him or her, which license shall cover the period in which he or she shall be so hunting or who shall furnish to another person a license issued to him or her, shall be fined not less than $25 nor more than $100 and costs of prosecution."

As indicated by its title, the purpose of the act is to propagate and protect game, animals, birds and fish, the ownership and title to which, by the first section of the act, is declared to be in the State. The Legislature, having so declared, proceeded to make provisions for the propagation and protection of this species of property of the State. The office of State Game Warden, at a salary of two thousand dollars per annum, was created, and provisions made for the appointment of Deputy Game Wardens. The duties of these officers were defined and the sum of fifty thousand dollars appropriated to pay their salaries and expenses incurred in seeing that the act is enforced.

Section 64 provides that all licenses, fines, penalties and forfeitures, collected under the act, shall be turned over to the State Treasurer to constitute a fund to be known as the "Game Protection Fund." This fund is only available for the payment of salaries and expenses of the game warden and his deputies. The act regulates the shipment of game and prohibits the shipment of any game not lawfully killed.

Section 69 makes it unlawful for any person, who

has lawfully killed game in the State, to ship or transport out of or within the State (except under permit) any protected game, unless the same is in his possession or carried openly as baggage or express by him. Such owner must have in his possession at the time, a resident or non-resident license to hunt, duly issued to him under the provisions of the act.

Section 70 provides that any person, company, corporation or common carrier, before shipping or transporting any birds or game, must ascertain if the person offering such birds or game for shipment is at the time in possession of a hunting license duly issued to *him*.

These sections make it obvious that no hunter can lawfully ship game without he has a hunting license, regardless of the county in which the game was killed or the place where offered for shipment or the point of destination. No person can receive for shipment, and no common carrier can carry, game or birds unless they have been lawfully killed; and the sole and only evidence that they have been lawfully killed, under the provisions of the two sections above, is that the person having the game in his possession and offering it for shipment has a license to hunt issued to *him*. The license to be issued is not a county or local license; whether issued to a non-resident, under the provisions of section 56, or to a resident under the provisions of sections 58 or 59, it authorizes the holder to hunt in any county in the State. There is no provision whatever in the act for the issuance of a license by the county clerk of one county to a resident of another county. The resident can only obtain a license from the clerk of the county where he lives. To obtain this license he must have been a bona fide resident of the State for at least six months next before his application for the license. He must make the required affidavit and pay the license fee of one dollar. This section contains the following proviso: "Provided, that this section shall not apply to owners and tenants

of farm lands, who may hunt on their lands without obtaining a hunting license."

It is declared by section 61, that "any person who shall hunt in this (State) without being at the time of such hunting in possession of a license, as herein provided, duly issued to him," etc., "shall be fined not less than $25 nor more than $100 and costs of prosecution." "As herein provided," means and can mean nothing else, than that the hunter must have in his possession a hunting license, issued to him in pursuance of the provisions of sections 56, 58 or 59.

The last clause of section 57 provides: "Any person violating any of the provisions of this act shall be deemed guilty of a misdemeanor and upon conviction be fined not less than $25 nor more than $100 and costs of prosecution."

The proviso at the end of section 58, exempting owners and tenants of farm lands from the provisions of the section and allowing them to hunt on their own lands without a license, is an express exception of this class of persons from the requirements of the act, in respect to license, and is the only express exception found anywhere in the act. The pointing out of this particular class of persons as exempt or excused from taking out a license to hunt, excludes all other classes, under the prevalent rule for construction of statutes, that the expression of one thing is the exclusion of another, and that nothing can be added to or deducted from the thing or class embraced in the terms of the exception. [State ex rel. v. Fisher, 119 Mo. l. c. 351, 24 S. W. 167; United States v. Dickson, 15 Peters l. c. 165.] And if section 54 is left out of view, the provisions of the other sections of the act (above quoted) clearly indicate that the Legislature intended that all hunters, except owners and tenants, hunting on their own lands, should take out a license, and to make it a misdemeanor punishable by fine to hunt without a license. Any other construction would be a perversion of the terms of sections 57, 58 and 61

of the act, and would clash with the provisions of sections 69 and 70. But when section 54 is brought into view, and an effort is made to construe it in harmony with the foregoing sections, we find that its terms are not only ambiguous in themselves, but that this ambiguity pervades other sections of the act, and that if the section (54) is construed to not require a resident to take out a license to hunt in the county in which he lives, such construction destroys the harmony of the act as a congruous, working whole, and in the main thwarts the purpose of the Legislature to create a game protection fund, as provided for in section 64. When a statute is ambiguous, or of doubtful meaning, the courts may look to extraneous facts for an explanation of the ambiguity. Since the case was first argued and submitted, we have been furnished with a copy of the original bill and our attention has been called to an amendment thereof, shown by the House Journal of the session of the General Assembly at which the bill was passed. We were in some doubt as to the admissibility of the official journals of the Legislature as evidence for the purpose of ascertaining the intention of the Legislature in the interpretation of a statute of doubtful meaning. Sedgwick says: "The tendency of all our modern decisions is to the effect, that the intention of the Legislature is to be found in the statute itself, and that there only the judges are to look for the mischiefs meant to be obviated, and the remedy meant to be provided," and that the legislative journals are not evidence of the intention of the Legislature. (Sedgwick on the Construction of Statutory and Constitutional Law, p. 205.) That the official journals of the Legislature may be resorted to for the purpose of showing that a statute was not passed in a constitutional manner, has always been the law. [Bradley v. West, 60 Mo. 33; The State ex rel. v. Field, 119 Mo. 593; 1 Sutherland on Statutory Construction, sec. 53.]

In Gardner v. Collector, etc., 6 Wall. 499, it was held that the journals of the legislative body might be

consulted for the purpose of fixing the date of the passage of a statute, when the date indorsed on it was incomplete.

In Southern Bank v. Commonwealth, 26 Pa. St. 446, it is said: "The legislative journals are evidence for the purpose of identifying a bill to which another act, passed by the Legislature refers."

Sutherland says: "The proceedings of the Legislature in reference to the passage of an act, may be taken into consideration in construing the act. Thus reports of committees made to the Legislature have been held to be proper sources of information in ascertaining the intent or meaning of the act. Amendments made or proposed and defeated may also throw light on the construction of the act as finally passed and may properly be taken into consideration." [2 Sutherland on Construction of Statutes, sec. 470.]

In Edgar v. Board of Commissioners, 70 Ind. 1. c. 338, the court said: "Where as in this case a statute has been enacted, which is susceptible of several widely different constructions, we know of no better means for ascertaining the will and intention of the Legislature than that which is afforded in this case by the history of the statute as found in the journals of the two legislative bodies."

In Buttefield v. Stranahan, 192 U. S., in discussing the constitutionality of an act of Congress, entitled, "An Act to Prevent the Importation of Impure and Unwholesome Tea," the court, at page 295, said: "As originally introduced in the house, the bill prohibited the importation of 'any merchandise as tea which is inferior in purity or fitness for consumption to the standards provided in section 3 of this act.' It was amended in the Senate by inserting the word 'quality' between the words 'purity' and 'fitness for consumption' wherever they occurred in the House bill. The amendment evinces the intention of the Senate to authorize the adoption of uniform, standards by the Secretary of the Treasury

which would be adequate to exclude the lower grades of tea. . . . The House concurred in the amendment."

In State v. Lancashire Insurance Co., 66 Ark. l. c. 472, it is said: "The settled rule, established by the highest authority, is that but little weight should be attached to expressions of individual members of the Legislature, or to the fact that certain amendments were rejected," citing Aldridge v. Williams, 3 How. (U. S.) 24.

In Baker v. Payne, 22 Oregon l. c. 342, an amendment to a bill fixing the time for the election of an attorney-general was looked to for the purpose of interpreting a section of the statute as passed.

In Barnard, Sheriff and Tax Collector, v. Gall & Pharr, 43 La. Ann. 959, it was held: "Courts may take judicial cognizance of the official journals of the houses of the General Assembly in order to aid them in ascertaining the true legislative purpose and intent where the same is doubtful." And in Blake v. National Bank, 23 Wall. 30, the journals of Congress were referred to, the court saying they were compelled to do so to ascertain the legislative intent.

Small v. Small, 129 Pa. St. 366, was a suit by the wife against her husband. On the question of her right to maintain such a suit, the construction of an act passed by the Legislature, in respect to husband and wife, was before the court for interpretation. The court resorted to the legislative records for the purpose of ascertaining the intent of the Legislature. The record of the proceedings in the Senate showed that the statute, as originally introduced in the Senate, expressly gave to husband and wife civil remedies against each other. This clause was sticken out by an amendment. The court, at page 369, after citing the legislative record showing the amendment, said: "No other reason can be given for the striking out of that provision, than that the Legislature in-

tended to withhold the right to maintain such a suit as this."

Section 3091, R. S. 1899, makes the printed journals of the House and Senate "prima facie evidence to the same extent that duly authenticated copies of the originals would be."

In State v. Hostetter, 137 Mo. 636, 39 S. W. 270, it was said: "In determining the meaning of an existing statute, it is proper to consider the prior law and all changes therein." Such is the general rule. It seems to us also proper, in construing a new statute that is of doubtful meaning, that amendments made to the original bill should be looked to, and that the journal of the General Assembly may be resorted to for this purpose.

The House Journal (page 18) shows that the original bill was introduced on January 16, 1905, by Mr. Warmsley, and entered upon the calendar as "House Bill, No. 15." In the bill as introduced, section 57 reads as follows: "It shall be unlawful for any person, after the passage of this act, to hunt in the State without first obtaining a license permitting him or her to do so; such license shall be dated when issued and shall authorize the person named therein to hunt during that year, and then only subject to the regulations and restrictions provided for by law." On January tenth the bill was read a second time and referred to the Committee on Game and Fish (H. J., p. 26). On January twenty-sixth, the bill was reported by the committee with the recommendation that the bill "do pass" with accompanying amendments (H. J., pp. 136, 137). On January twenty-seventh the bill was called up for engrossment (H. J., p. 159) and further consideration was made a special order for January thirtieth (H. J., p. 161). On January thirtieth the bill was called up and ordered engrossed and printed, and section 57 was amended by inserting between the words "state" and "without" in the second line of the section, the words "outside of the county in which he lives." (H. J., p. 178). On February sixth the bill was

reported "correctly engrossed" (H. J., p. 260). On February eighth the bill was put upon its passage and failed to pass (H. J., p. 303). On the same day a motion to reconsider the vote by which the bill failed to pass was adopted and the bill was put upon its passage and passed, except the emergency clause which failed to pass (H. J., p. 313). Some amendments were offered to the bill in the Senate but none to section 57. The Senate amendments were concurred in by the House. On March second the bill was read a third time and passed (H. J., pp. 644, 645). On March eighth the Committee on Enrolled Bills reported the bill "correctly enrolled" (H. J., p. 781). On March tenth the bill was returned to the House with the Governor's approval (H. J., p. 823). Two or three sections of the original bill were stricken out by amendments, and section 57 of the original bill became section 54 in the bill as engrossed and passed. As clearly indicated by the language of section 57 (original bill) the purpose of the drafter was to make it unlawful for any person to hunt in the State without a license, save those coming within the exception at the end of section 58. By the amendment the language of the section is so changed as to make it unlawful for any person to hunt in the State "outside of the county in which he lives" without first taking out a license. This amendment of the terms of the section, while it does not, in express words, declare a resident may hunt in the county in which he lives without first taking out a license, makes it manifest that the Legislature intended that he might do so. No other reason can be given for the amendment, than that the Legislature did not intend a resident should be required to have a license to hunt in the county in which he lives. But even should this construction be considered doubtful, then the statute, being a penal one, the doubt must be resolved in favor of the petitioner, and the statute construed so as not to embrace, by judicial construction, persons not plainly within its terms. [State v. Reid, 125 Mo. 43, 28 S. W.

172; State v. Gritzner, 134 Mo. 512, 36 S. W. 39; State v. Howard, 137 Mo. 289, 38 S. W. 908; State v. McCance, 110 Mo. 298, 19 S. W. 648; State v. Burke, 151 Mo. 136, 52 S. W. 256; State v. Balch, 178 Mo. 392, 77 S. W. 547; Rixke v. Western Union Tel. Co., 96 Mo. App. 406, 70 S. W. 265; Bishop on Statutory Crimes, sec. 194.]

We think the legislative history of the bill, above set forth, dispels all doubt in respect to the proper construction of section 54, and that this history makes it manifest that the Legislature did not intend to declare it unlawful for a resident to hunt in the county in which he resides without first taking out a hunter's license. The exception at the end of section 58 will harmonize with this construction when it is remembered that many residents of the State own farms and lands in counties of the State other than the one in which they reside, and that the exception was made to permit such owners to hunt without license upon lands which they own in counties other than the one in which they live.

We conclude that the petitioner's conviction was illegal, that the judgment against him is without warrant of law and is void, wherefore it is considered and adjudged that he be discharged from the custody of the sheriff and go hence without day. All concur.

GOODE, J. (concurring).—Each party to this controversy has endeavored to construe the contradictory provisions of the statute under which the petitioner was convicted, so as to render them consistent with each other. In my opinion neither party has succeeded very well in the attempt. I have reached the conclusion that it does not so plainly appear that the Legislature intended to make it an offense for a person to hunt in the county of his residence without a license as to justify a conviction for such an act, and for that reason favor the discharge of the petitioner. The rule is that crim-

inal statutes should be strictly construed and not extend-ed so as to embrace persons not within their terms. [State v. Reid, 125 Mo. 43, 48, 28 S. W. 172.]