## E. FARLEY v. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY OF TEXAS.

### Decided December 19, 1903.

**1.—Personal Injury—Verdict Held Not Too Small.**

Evidence considered and held not to warrant the appellate court in setting aside, as too small, a verdict in plaintiff's favor for only $1000, for personal injuries to a railroad machinist, 61 years old, earning $100 per month, which confined him to his bed for two months, were attended with considerable suffering, and, as plaintiff testified, would permanently incapacitate him from work.

**2.—Verdict—Amount for Jury—Personal Injury.**

Where there is not a legal measure of damages and they are unliquidated, the appellate court will decline to interfere because of the amount assessed by the jury unless it is so great or small as to indicate that the jury must have found it while under the influence of passion, prejudice or gross mistake.

**3.—Jury—Right to Discredit Evidence.**

Evidence as to which there is no opposing testimony may be contradicted by circumstances, and where an interested witness, testifying as to his suffering and incapacity to do further work, is before the jury in person, it is peculiarly their province to determine the credibility of his evidence.

Appeal from the District Court of Grayson. Tried below before Hon. Rice Maxey.

*Wolfe, Hare & Semple* and *Templeton & Tolbert,* for appellant.

*T. S. Miller* and *Head & Dillard,* for appellee.

TALBOT, ASSOCIATE JUSTICE.—Farley brought this suit in the District Court of Grayson County to recover damages sustained by reason of personal injuries alleged to have been inflicted upon him through the negligence of the defendant railway company while at work in its repair show as a machinist. There was a trial by jury and a verdict and judgment for plaintiff for $1000. Plaintiff, being dissatisfied with the amount of this judgment, has perfected an appeal to this court.

Plaintiff alleged in substance that on December 22, 1901, he was in the employ of defendant, as a machinist, in its shop at Denison, Texas. That in the performance of his duties it became necessary for him to operate an electric crane or car constructed in said shop, to be used in moving engine wheels and axles to and from a wheel lathe where they were prepared for use in constructing and repairing locomotives. That said crane or car was propelled by electricity, and was operated on a track, like a locomotive, elevated about ten feet above the floor of said shop. He charged negligence on the part of defendant in the construction of said crane or car and said track, and that both were negligently permitted to become out of repair, the wheels to become worn and the parts of the same to become loose and insecure, and the timbers on which same rested to spread, so that the crane would run off the track. That defendant had notice of the condition of the said crane and track, and that the same was dangerous. That about Decem-

34 Civ.—6

ber 15, 1901, plaintiff learned that the crane and track were out of repair and reported this condition to his foreman, and the foreman promised to repair and fix them. That about 4 o'clock a. m., December 22, 1901, while plaintiff was moving a pair of driving wheels of a locomotive with said crane it, together with said wheels, fell from the said track down upon plaintiff and broke his right leg between the knee and hip, cut a gash in his head, burned his left forearm with electricity, bruised and injured his left elbow, shoulder, back, spinal column and left leg; that said injuries are permanent, have caused mental and physical pain, and will prevent him from doing any work. That said injuries have and will in future cause his time, worth $125 per month, to be a total loss, have and will in future cause him to incur expense for medicine and doctor's bills in the sum of $1000. That when he was injured it was dark and impossible for him to know the condition of the crane, and he supposed the same had been fixed.

Defendant denied the allegations in plaintiff's petition, and pleaded specially contributory negligence and assumed risk.

The track on which the crane or car was operated was about twelve feet above the floor of the shop in which plaintiff was at work at the time he was injured. The rails of said track were made of ordinary railroad rails, and were about twelve feet apart. The crane had four wheels, two of which ran on each rail of this track, and together with the driving wheels of the locomotive, which were being moved by plaintiff, were very heavy. On account of the defective construction of the crane or the track, or by reason of the spreading of the track because of the same becoming loose or worn and otherwise out of repair, the crane and wheels ran off the track, fell and injured plaintiff. The defendant railway company was guilty of negligence in the respects alleged by plaintiff, and such negligence was the proximate cause of plaintiff's injuries. There was no contributory negligence on the part of the plaintiff, and the verdict of the jury and judgment of the court are warranted and sustained by the evidence.

It is insisted that the damages allowed by the verdict and judgment are manifestly too small to compensate plaintiff for the injuries sustained, and that the trial court erred in not granting plaintiff a new trial. Our statute provides that new trials may be granted as well when the damages are manifestly too small as when they are too large. Rev. Stats., art. 1448. Many cases may be found in which the question of excessiveness of the verdict has been discussed and passed upon by our courts, but the research we have been able to make has brought to our knowledge but few where the smallness of the verdict was under consideration. To the rarity of such verdicts is doubtless due the paucity of our decisions on the subject. As to the character of plaintiff's injuries and the damages sustained by him, he testified in substance as follows: "I know that the crane fell on me. It knocked me down, cut a hole in my head, mashed my arm up, and burned my wrist with an electric wire, I suppose it was; I did not see it. It gashed my head

a pretty good cut, mashed my left arm considerably, burned my left wrist and forearm, my right leg was broken right in through the thigh between the knee and the hip. It was broken, I should judge, about six inches above the knee. I know I can not use my right leg only when they lift it up; this whole hip and whole leg. It seems my left leg was injured; it was a flesh injury mostly. My left heel was mashed until it hurts me now to lie on it. A certain way on the heel it hurts me a great deal. My back was hurt. None of the rest of my injuries seem to pain me as much as my back and hip. I have pain yet under my ribs; acute pain, is low down, running down in my hip bones. I have had a great deal of pain, and have yet, in my hip bones. I do not know much about what was done there after the crane fell on me. I know they carried me home and the doctor was called. I can not tell how I got out from under the crane, but I got out myself. I can not tell you how I did it. They carried me home on a stretcher and put me to bed. I took my bed on account of injuries. I guess I did not get out of bed for about six months. Dr. Acheson, the company physician, was my physician, and he treated my injuries. My injuries caused me pain, and I have never been free from pain yet. At the time these injuries were inflicted I should judge I suffered a good deal. They gave me opiates, so they told me. I know my injuries hurt me. I had a great deal of pain at the time; especially my back and hip pained me. I have suffered pain since that time. I have never been without it. I have not seen a minute without it. I am 61 years old, past. These injuries were inflicted over a year ago, a year ago the 22d of last month. Before I was hurt my health had always been reasonably good. I was never sick to amount to anything. Some six or eight months before I got hurt I had some stomach trouble caused by my teeth. I had the teeth taken out, and after I had good health. I commenced work at my trade as an apprentice before I was 18 years old, something over forty years ago. During that time I do not suppose I lost two weeks from my work on account of sickness. I was never sick to speak of at all during that time. Since I got hurt my hair has turned considerably; it has turned a great deal in the last year and makes me look a great deal older. At the time I was injured I was paid standard wages in the shop, 33 cents per hour. I was working ten hours a day and drawing eleven hours pay. I got eleven hours' pay for week day nights, and Sunday I got pay for fifteen hours for working ten hours. I worked every night. Never lost a night. Since I got hurt I don't suppose I could do much work. I have not been able to try. I have to go on my crutches. I can not walk at all; can not bear any weight on my right leg. This seems to be caused by my hip. My right leg is a good deal shorter than the other. I judge it is an inch or more shorter. This leg is crooked now; it is crooked at the place where it was broken. My knee is stiff; it has been that way ever since I was hurt. The trouble in my right hip I suppose was caused from my being hurt. I never had any trouble with it before. Before I was hurt there was never

any difference in the length of my legs, and I was never troubled with my right knee. [Witness stands up and exhibits his legs to the jury.] I should judge that my injuries affected my nervous system. I can hardly do anything; hardly write or do anything else; I can not use my right hand very much. I can do nothing like that. I go to jerking and trembling. Am bothered a great deal about sleeping. I can not lie well on my back on account of my right leg. I can not lean over on that leg because the knee is so stiff it sticks the foot up; and when I turn over on the left side I have to put a pillow between my legs to keep them apart. I can not lie with them together at all. I can not lie with the right leg across, there is so much pain in my right hip. Before I was hurt my nerves were good so far as I know. I never had any trouble with my nerves. I have not worked since I was hurt. Since I was hurt I have gone on my crutches to the coal bin and got a small coal scuttle full of coke, one that would hold about half an ordinary coal scuttle, and took it in one hand and moved one crutch and then took it in the other hand and moved the other crutch and got into the house. I have done that a number of times to help the women folks. That is all the work I have done since I was hurt. I have not made any effort to get any employment; if I had tried to find any at all, I could not have done it. I have not felt able since I was hurt to try to get employment. I am considerably nervous now. I am in pretty good order, I know, but still I couldn't do much labor. Before I was injured I weighed 180 pounds, and now I weigh 186."

On cross-examination he testified: "When I worked in the day time I got the same wages; that is, I worked ten hours and got ten hours' pay at 33 cents per hour. My wages then was an average of about $100 a month I guess; they would average more than ninety."

Plaintiff's wife testified: "After he was hurt he was brought home and has been there at home all the time since then. When he was brought home that night he appeared to be suffering. He was suffering with his back. He complained of his back and hip and arm. He did not complain of the limb that was broken, but the limb that was mashed he complained of. The right limb was broken, the other one was mashed. He complained of the left limb. He has never quit complaining. His misery seemed to be about five and one-half or six months. We used opiates all the time to numb his pain. I administered these medicines to him. He has not done any work since he was hurt."

Dr. Acheson testified that he was the local physician for the defendant railway company. That he had known plaintiff for a number of years. That plaintiff's health had been excellent, with the exception of one spell of sickness extending over two or three days about three years ago. "He has not been weak or sickly to my knowledge. I was called to attend to the plaintiff's injuries about the 22d day of December, 1901. Plaintiff remained under my care for several months. In the beginning I visited him two or three times a day, dropping afterwards to twice a day and finally diminishing to one visit a day. During that time I

made thorough examinations of the plaintiff. For a period of two or three weeks the examinations were daily. Plaintiff had received contusions upon the body which resulted in the fracture of the right thigh bone and the injury of the lower portion of the spine and some bruises and injuries on the other parts of the body. Plaintiff's condition following his injuries was one of prostration attended by fever, indigestion and disability, which made his case for a time almost hopeless. Shortly after that his digestions made the secretions become more perfect and the fracture was repaired, though very slow about repairing. At the end of six months he became able to move around the house. The plaintiff, as a result of his injuries, has not fully recovered. I don't believe he will be able to do as much in the future as when he was injured. The injury received by plaintiff caused severe pain and suffering which extended over a period of several weeks. I do not know whether the plaintiff is now suffering pain or not. After the plaintiff received his injuries he was confined to his bed for about two months or more. This length of time was absolutely necessary on account of his injuries. The plaintiff's injuries have affected his ability to work and get around. The injuries have affected the system in such a way that it is painful for him to assume the stooping position, but I can not say how much nor how long this condition will continue. The right leg is likely shorter than the left. He has not been able to use it. The bone where it was broken has joined together at the place of fracture and is slightly crooked, as is normal and as it ought to be. The bone where it was fractured has grown back and the bone is not weak by the fact that it is crooked, and the thigh bone is not normally straight, but crooked. Plaintiff's injuries affected his nerves and nervous system, and this condition continued for a period of over six month. The only broken bone in plaintiff's body was his right thigh bone, which is now healed, and there is a good union. Plaintiff's case has progressed, and continued improvement is expected in the future. I do not know whether plaintiff could get along without his crutches or not. That would depend on how far he might want to go. There was no break or dislocation of any bones except the right thigh bone, and that is healed. There was no break or dislocation of any of the bony tissues about his arm. Plaintiff's spinal cord was in no way injured, but there were bruises on his back. There were no breaks or dislocations to plaintiff's knees or ankles. Plaintiff's age would necessarily make his recovery from injuries slower than it would in a young person, as far as the nervous or muscular system is concerned. It takes longer to right the secretions and repair the injuries to muscular and nervous system and the bruises are generally slower in the case of old people, but in the repair of bones old people generally encounter repair quicker than young people."

This witness testified by deposition given December 9, 1902. Plaintiff's expectancy was about 14 9-100 years. "In my surgeon's report made immediately after the accident I said that there was a fracture

of the right femur on the lower third, a scalp gash and bruises on the arms and back, and these were the only troubles I found. The bone where it was fractured is stronger than before it was broken."

The rule upon the question involved in this suit, as stated in 1 Southerland on Damages, 1 ed., 810, seems to have been generally recognized. He says, "Where there is not a legal measure of damages, and where they are unliquidated, and the amount thereof is referred to the discretion of the jury, the court will not ordinarily interfere with the verdict. It is the peculiar province of the jury to decide such cases under appropriate instructions from the court, and the law does not recognize in the latter the power to substitute its own judgment for that of the jury. Although the verdict may be considerably more or less than, in the judgment of the court, it ought to have been, still it will decline to interfere unless the amount is so great or small as to indicate that the jury must have found it while under the influence of passion, prejudice or gross mistake."

The testimony of the witnesses in this case, if literally true, would unquestionably entitle plaintiff to a verdict for a larger amount of damages than awarded him. Taking into consideration, however, all the circumstances of the case, and the action of the lower court in reference thereto, can it be said that this court ought to conclude that the verdict rendered was the result of "accident or perverted judgment, and not of cool and impartial deliberation?"

In the case of Elwood v. Western Union Telegraph Co., 45 N. Y., 553, cited by counsel for appellee, it is said by Rapallo, Judge, speaking for the court: "It is undoubtedly the general rule that where unimpeached witnesses testify distinctly and positively to a fact and are uncontradicted, their testimony should be credited and have the effect of overcoming a mere presumption. But this rule is subject to many qualifications. There may be such a degree of improbability in the statements themselves as to deprive them of credit, however positively made. The witnesses, though unimpeached, may have such an interest in the question at issue as to affect their credibility. The general rules laid down in the books at a time when interest absolutely disqualified a witness necessarily assumed the witnesses were disinterested. That qualification must, in the present state of the law, be added. And furthermore, it is often a difficult question to decide when a witness is, in a legal sense, uncontradicted. He may be contradicted by circumstances as well as by statements of others contrary to his own. In such cases courts and juries are not bound to refrain from exercising their judgment and to blindly adopt the statements of the witness for the simple reason that no other witness had denied them and that the character of the witness is not impeached." See also, Allison v. Gulf, C. & S. F. Ry. Co., 29 S. W. Rep., 425; Newton v. Pope, 1 Cow., 110; Lonier v. Meeker, 25 N. Y., 361; Wait v. McNeill, 7 Mass., 260. Numerous cases may be found in the reports of our own courts in which it has been said, in effect, that although the court might be of the opinion

that the verdict of the jury was too large, yet appellate courts should be very cautious in disturbing them, especially when the court below had overruled a motion for a new trial. In the case before us the plaintiff was present in court and testified. The jury was afforded an opportunity to observe his appearance and manner of testifying. Notwithstanding he claimed to have suffered from nervousness and great mental and physical pain, since the date of his injuries, yet he further testified that he had increased in weight during that time six pounds. That at the time he received his injuries he weighed 180 pounds, and at the date of the trial he weighed 186 pounds. When reminded of his increase in weight he remarked upon the witness stand, "I am in pretty good order, I know, but still I couldn't do much labor." This remark, together with plaintiff's appearance and demeanor, were circumstances and legitimate evidence for the consideration of the jury in determining the weight to be given to plaintiff's testimony, and in determining the actual extent of his injuries and suffering. That they concluded from this and other evidence the same had been exaggerated by the oral statements of the witnesses, is evident by their verdict, and we do not feel authorized to say that such conclusion was not justified. The testimony of Mrs. Farley adds but little strength to plaintiff's case, and notwithstanding the testimony of the physician, relative to plaintiff's suffering and the time he suffered, yet it occurs to us that the jury might have reasonably concluded from other portions of his testimony and other circumstances of the case that the only real injury plaintiff sustained was a fracture of the leg. Dr. Acheson testified: "In my surgeon's report made immediately after the accident I said that there was a fracture of the right femur on the lower third, a scalp gash and bruises on the arm and back; and these were the only troubles I found." He further states that the bone where fractured is stronger than before it was broken. His testimony to the effect that it was painful for plaintiff to assume a stooping position was evidently based on what plaintiff told him about it, as the injuries to plaintiff's back appear so slight, from the physician's description of them, as to indicate no permanent or serious hurt.

The witnesses were in the presence of the court and jury; both heard them testify and had a better opportunity of judging of their credibility than this court could possibly have. This advantage of the trial judge and jury has often been adverted to by our Supreme Court in passing upon similar questions to the one involved here, and that court has usually been very slow to set aside the verdict of the jury, where, as in this case, a motion for a new trial had been overruled by the judge who presided at the trial. Upon the whole case, as it appears to us, we are not prepared to say that the amount of the verdict is manifestly too small, and that we would be warranted in setting it aside.

The other assignments of error relate to rejection of evidence, charge of the court, and newly discovered evidence bearing upon issues decided by the jury in favor of the plaintiff. We have examined these assignments and believe no error was committed except possibly in the charge

complained of. The issues, however, to which these rulings relate, having been found in favor of plaintiff, the errors therein, if any, are harmless, and we deem it unnecessary to discuss them, as they can not affect, in our opinion, the disposition to be made of this appeal. We conclude that the verdict in this case is not so small as to indicate that it was the result of passion, prejudice or mistake, but is warranted and sustained by the evidence, and the judgment of the court below is therefore affirmed.

*Affirmed.*