**BURROUGHS et al. v. SMITH.**
(No. 11756.)

Court of Civil Appeals of Texas. Fort Worth.
April 2, 1927.

Rehearing Denied April 30, 1927.

1. **Appeal and error** ☞212—**Erroneous direction of verdict is fundamental error.**

Action of trial court in erroneously directing verdict constitutes fundamental error.

2. **Trial** ☞178—**On motion to direct verdict, evidence of opposite party is construed most favorably in his favor; contrary evidence being disregarded.**

On motion to direct verdict, evidence of opposite party is taken as true and given most favorable construction and benefit of all reasonable inferences; other evidence being disregarded.

3. **Trial** ☞139(1)—**Weight of evidence is for jury, not court.**

Consideration of weight of evidence is within province of jury, not that of trial court.

4. **Specific performance** ☞123—**Evidence held to make issue for jury, in action for enforcement of deceased's contract to give plaintiff his property in return for care during lifetime.**

In action against administrator and heirs to enforce agreement, by which deceased was to give plaintiff his property in return for care during his lifetime, evidence *held* sufficient to make issue for jury.

5. **Frauds, statute of** ☞129(9)—**Title to real property will pass by parol on delivery of possession, followed by improvements thereon by grantee.**

Title to real property will pass by parol contract or gift on delivery of possession, followed by valuable improvements, made thereon in good faith by grantee.

6. **Frauds, statute of** ☞159—**Reservation of room on premises on which grantee made improvements did not as matter of law prevent delivery of possession relied on to take contract out of statute.**

Mere fact that grantor reserved room on premises did not, as matter of law, disprove fact of delivery of possession, bringing case within statute as to grantees who made subsequent improvements.

Appeal from District Court, Tarrant County; R. E. L. Roy, Judge.

Suit by Lillian Burroughs and husband against Myron A. Smith, administrator of the estate of Marshall Jennings, deceased, and others. Judgment for defendant named, and plaintiffs appeal. Reversed and remanded.

Houtchens & Clark, of Fort Worth, for appellants.

Bryan, Stone, Wade & Agerton and Myron A. Smith, all of Fort Worth, for appellee.

CONNER, C. J. This suit was instituted by Mrs. Lillian Burroughs, joined by her husband, against the heirs and legal representatives of Marshall Jennings, deceased, to enforce an alleged agreement on the part of Marshall Jennings, a bachelor, and his mother, Mrs. Carrie Hinesdale, a widow, to take her and rear her in their home, and upon their death leave her all property of which they were seized and possessed. The plaintiff alleged that she had been taken into the home of Mrs. Hinesdale and Marshall Jennings and lived with them for many years, during which time they had fed, clothed, and taken care of her the same as if she had been their own child; that Mrs. Hinesdale took her on trips and was with her constantly; that the plaintiff did the household duties and worked about the place as a child would naturally do for her natural parents; that during the years in which the plaintiff lived with them there grew up between her and said parties love and affection, and they came to care for her and love her and she in turn reciprocated their love and affection; that she actively entered into the household duties and waited on them when they were sick as best she could; that they, in consideration for her care and attention and in consideration of their love and affection, told her and led her to believe and they did agree that upon their death plaintiff should receive all of the property of which they were seized and possessed at the time of their death; that Mrs. Hinesdale died on the 7th day of July, 1922, without children other than Marshall Jennings; that during the last sickness of Mrs. Hinesdale the plaintiff waited on and attended to her wants and needs; that Mrs. Hinesdale and her son, Marshall Jennings, owned a lot described in the plaintiff's petition upon which Marshall Jennings remained in possession; that Marshall Jennings recognized the rights of plaintiff to her interest in said property in keeping the agreement and understanding had between Mrs. Hinesdale, himself, and the plaintiff, it being expressly agreed and understood by and between the parties that at the death of Mrs. Hinesdale, if she died prior to Marshall Jennings, plaintiff should share equally with Marshall Jennings in whatever property or estate was left by Mrs. Hinesdale.

Plaintiff further alleged that after the death of Mrs. Hinesdale she married her co-plaintiff, E. E. Burroughs, in October, 1922, and that Marshall Jennings agreed with her that if they would move to and occupy the property above described and look after him and his needs and wants during his old age and during his lifetime, he would, for and in consideration of his love and affection for her, and for what she had done in the care of his deceased mother and him, give to her

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the property above described, together with an adjacent lot which he himself had bought. She further alleged that pursuant to said agreement and understanding, she did look after Marshall Jennings, tend to his needs and wants, and furnished him a home in the way and manner he desired, caring for him, furnishing food and medicine in time of illness until his death, and, in keeping with said agreement and understanding, entered into actual possession of the property mentioned and made valuable and permanent improvements thereon and had been in possession, openly and notoriously, since said time.

Plaintiff further alleged that, for the consideration above stated, the agreement was to the effect that Marshall Jennings, upon his death, should leave to her all property which he owned, both real and personal.

According to further allegations in the petition, Marshall Jennings died on December 20, 1925, leaving no children or descendants, only distant relatives, Tennie Smith, an aunt, and Ben Cooley, a nephew, who were made parties to the suit.

It was further alleged that, in addition to the property above described, Marshall Jennings owned certain personal property consisting of money in the possession of a Fort Worth bank, a corporation also made a party defendant, approximately in amount of $7,000, and also owned approximately $150 in Liberty bonds of the United States, and certain shares of stock in the Klan auditorium of the city of Fort Worth, and other personal property, which had been seized and was in possession of Tennie Smith, the aunt. The plea of plaintiff was, among other things, for an enforcement of the agreements alleged.

Mrs. Tennie Smith and others claiming to be heirs of Marshall Jennings answered by a general demurrer, a general answer, and specially to the effect that the agreement set forth in the plaintiff's petition was void and unenforceable in so far as the real estate was concerned, in that it was in violation of the statutes of fraud, and, further, specially denied the agreement, charging that the plaintiff had lived with Mrs. Hinesdale during her life solely in consideration for her food and clothing and with Marshall Jennings a short time prior to his death solely for the purpose of receiving free rent.

The Fort Worth Bank, made a party defendant, answered that at the time of the death of Marshall Jennings he had on deposit with said bank the sum of $7,213, which was now claimed by both the plaintiff Lillian Burroughs and her husband, and by Myron Smith, who had been appointed administrator of the estate of Marshall Jennings. The bank tendered the money into court and prayed that the administrator, Myron Smith, be made a party and that it be relieved with an allowance for its expenses and attorney's fees.

The administrator, Myron Smith, appeared and among other things entered a plea of not guilty, alleging that he had been appointed administrator on January 20, 1926, adopted the answer of the other defendants on file, with a prayer that upon a hearing he be "decreed possession of all property in controversy in this suit free and clear of and from any and all claims of plaintiffs or the defendant Fort Worth National Bank, and that there issue herein all writs or process necessary to place him in possession thereof, and that all costs herein be taxed against plaintiffs."

A jury to try the case was impaneled, and evidence in behalf of the plaintiffs offered, at the conclusion of which the defendant administrator moved the court to give a peremptory instruction in his favor. As shown by plaintiff's bill of exception, upon an indication on the part of the court that he would sustain the motion of the administrator to give the peremptory instruction, the plaintiff moved the court to enter a nonsuit of the plaintiff's case. This the court at first refused to permit, but later did, except in so far as such dismissal might affect the cross-action of the administrator, but ruled that the cross-action, as it was termed, of the administrator was yet before the court, and thereupon, no evidence having been tendered save that which had been tendered by the plaintiff, the court gave the jury a peremptory instruction for the defendant administrator as had been requested. The jury in obedience to the instructions so returned their verdict and judgment for the administrator was accordingly ordered, to all of which the plaintiffs duly excepted and have duly prosecuted an appeal to this court.

Error is assigned to the action of the court in giving the peremptory instruction referred to. Whether error or not depends upon the testimony upon which the court based his instruction. The following, we think, is a fair statement of that testimony:

The plaintiff Lillian Burroughs, formerly Lillian Maben, was taken into the home of Mrs. Carrie M. Hinesdale and her son, Marshall Jennings, when she was 6 years of age, and lived with them continuously as their own child until she was 13 or 14 years of age. During this time she went to school and did the housework as any child would do for her natural parents. Mr. Jennings was working at night, and Mrs. Hinesdale, who was then an elderly woman, and Lillian were the only ones living there. During this time she learned to cook, and Mrs. Hinesdale would put stuff on the stove and Lillian would finish it, and she would get up and cook Marshall Jennings' breakfast for him. She fixed him his oatmeal, toast, and coffee every morning, and Mrs. Hinesdale was in bed. During the years that Lillian lived there she stayed there all the time, night and day; she waited on Mrs. Hinesdale, who was

sick a great deal. She ran errands for her to the grocery store, drug store, and such as that, and when Mrs. Hinesdale went on trips she took Lillian with her. Lillian was born in the year 1903, and it was approximately 1909 or 1910 when she first went to live with Mrs. Hinesdale and Marshall Jennings. She lived there continuously from the time she was 6 years old until she was 13. For two years after she was 13 years old she would go back and stay during the day and after school with Mrs. Hinesdale. She later worked at the telephone office for several years. On July 7, 1921, Mrs. Hinesdale died, leaving Marshall Jennings living alone on the old homestead on West Seventh street. The following October, approximately three months after the death of Mrs. Hinesdale, the plaintiff Lillian Burroughs, who had married the coplaintiff, E. E. Burroughs, returned to said place where she had lived as a child with Mrs. Hinesdale and Marshall Jennings. Marshall Jennings retained a room and took some of his meals with the plaintiffs. The plaintiffs and Mr. Jennings continued to live there until his death, December 19, 1925. Marshall Jennings, prior to his death, stated to one of the witnesses that Lillian had been good to him and his mother, had stayed there and waited on his mother 7 years, and had waited on him for 4 years, and he said that his mother always told him to look out after her as long as she lived; he said that if he died he was going to leave what he had left to Lillian. He had several conversations with this witness, who was an ex-soldier of the Philippine War, as was Marshall Jennings, and whom he had known for a long time, and one of the conversations was a short time before he died. In this conversation he stated that his kinsfolk never did come to see him only when they wanted something. The plaintiffs found Mr. Jennings dead one Sunday morning; namely, December 19, 1925. He did not work on Sunday and plaintiffs usually let him sleep late, but about noon, not seeing him, when they opened the door they found him dead, sitting in his chair. Mr. Jennings further stated prior to his death, to another witness, that none of his people cared—seemed to care—much for him; that he intended to leave all he had to Lillian; that she had been there, and took care of his mother, and stayed there for quite a while, I don't remember just how long, and she had been there taking care of it since for him. He further stated to this witness that, as he had told her before, she was to look after the property and him, if he ever needed looking after, and it was all hers in time to come, that he intended for that to be hers, always intended, that he just lived there with her, and it was hers to look after and keep up. Mr. Jennings told another witness that as long as he was living, and as long as Lillian was living, he would take care of her; as

long as she lived she could always have that place there, as long as she wanted it and as long as he had it. He said that he thought as much of her as if she were one of his own sisters, if he had any. He said that his other kinsfolk should not have a damn thing he had if he could keep from it—that is the way he expressed himself about it. He said they never came around him unless they wanted something. He said, of course, the big fellows did not need anything. Both Mrs. Hinesdale and Mr. Jennings thought the world of Lillian. Lillian and her husband and baby and Mr. Jennings were the only ones living on the premises for the 3 or 4 years next prior to his death. During this 4 years none of his kinsfolk were ever seen to visit him, except the aunt, Tennie Smith, who came by one time on her way from Montgomery Ward's and talked a few minutes to him on the front porch. After the plaintiffs moved there in 1921, and while they were living there with Marshall Jennings, with his consent and knowledge, at their own expense, put up screens on five rooms, including three screen doors; put up a wire chicken fence in the back 100 feet long; put up some outhouses; put up a store building, which was a permanent structure of the reasonable market value of approximately $500; put in a stock of groceries and conducted a grocery store business prior to and were conducting the same at the time of Mr. Jennings' death, and have been conducting said business since said date; had the wiring done and lights put in the grocery store, and had lights and gas meters put in. In discussing putting in of the gas, Mr. Jennings said to her, that she was to look after the property and him, if he ever needed looking after, and it was all hers in time to come.

[1-3] In considering the question presented it is necessary that we keep in mind certain fundamental principles of law as an aid and guide to our conclusion: First, an erroneous action of the trial court in directing a verdict is fundamental error. Terry v. Witherspoon (Tex. Civ. App.) 239 S. W. 300; Egan v. Lockney Farmers' Co-operative Society (Tex. Com. App.) 284 S. W. 937. Second, on motion to direct a verdict the court presumes to be true the evidence of the opposite party, who is entitled to the most favorable construction that it will properly bear and to the benefit of all reasonable inferences arising therefrom. Only evidence tending to prove his case will be considered. All contradictory or countervailing evidence is left out of view. It is for the jury, and not the trial court, to weigh the evidence. 38 Cyc. 1586; Eastham v. Hunter, 98 Tex. 560, 86 S. W. 323; M., K. & T. Ry. Co. v. Yale, 27 Tex. Civ. App. 10, 65 S. W. 60.

In the case of Harpold v. Moss, 101 Tex. 540, 109 S. W. 928, the trial court peremptorily instructed the jury, and the Court of

Civil Appeals (106 S. W. 1131) first reversed the case and then on motion for rehearing affirmed the judgment of the trial court. A writ of error was granted by the Supreme Court, and in an opinion written by Chief Justice Gaines the case was reversed and remanded. In speaking of the right of the trial court to peremptorily instruct the jury, he said:

" 'In determining this question we must consider the evidence in its most favorable aspect for the plaintiffs in error, disregarding conflicts and contradictions. They raised the issue of credibility, which was a question for the jury.' To judge of the credibility of the witnesses and the weight to be given to their testimony is peculiarly the province of the jury. Hence, whenever the court undertakes to say that the testimony of a witness is entitled to no credit, because it is overborne by contradictory testimony, or that it is so contrary to circumstances in proof which render it improbable, it very clearly assumes the function of the jury, and its ruling should not be permitted to stand."

Where "by any fair and legitimate inference plaintiff's case can be supported, or where there is any evidence which would support a verdict of plaintiff, where the proof admits of any doubt, even though the facts testified to by plaintiffs are improbable, or although plaintiff's evidence may be inconsistent, the motion to direct a verdict should be denied." 38 Cyc. 1578; Willis v. Thacker, 20 Tex. Civ. App. 233, 49 S. W. 128.

"The situation, relation, circumstances of the parties and of the object of the gift, to be taken into consideration in determining the intention of parties. Thus the court may consider not only the intention of the donor at the time of the gift, but also the donor's previous life, habits, and relations to others, so as to ascertain the natural or probable object of his bounty, especially to discovering any settled purpose he had in regard to the disposal of his estate. The evidence of the friendly or affectionate relations existing between the parties, or that the donee had been reared by and worked for the donor, or had rendered him a great service is also acceptable." 28 Cyc. 674.

"It is an elementary rule that the existence of a parol contract, and its extent and limitations, is a question of fact." Amber Petroleum Co. v. Breech (Tex. Civ. App.) 111 S. W. 669.

"Direct evidence is not required by law, and juries are allowed to indulge all reasonable inference from the facts revealed to them by the evidence, of which unbiased and rational minds can properly adduce from the facts adduced before them." Cotton v. Cooper (Tex. Civ. App.) 160 S. W. 601; Farley v. Ry. Co., 34 Tex. Civ. App. 81, 77 S. W. 1040; Greenleaf on Evidence (15th Ed.) par. 48.

"A fact can be proved by circumstances as well as by direct testimony, and we know of no rule that such circumstantial evidence must exclude every hypothesis that something might have happened other than the fact establishd by the circumstantial evidence. If the circumstances establish a preponderance of the evidence in favor of a certain proposition, it is proved." St. Louis, B. & M. Ry. Co. v. Moss (Tex. Civ. App.) 203 S. W. 777.

The case of Clarkson v. Whitaker, 12 Tex. Civ. App. 483, 33 S. W. 1032, was a suit upon an alleged contract entered into by a person, since deceased. The defendant raised the question as to the sufficiency of the evidence to establish any agreement or contract. The plaintiff offered the testimony of a witness, Goodrich, and in speaking of the testimony of this witness, the appellate court said:

"The testimony of Judge Goodrich was properly admitted. Clarkson being dead, Whitaker could not testify, himself, to the contract sued on; and there being no witness to it, any circumstances tending in any degree to support Whitaker's contention was admissible."

In the recent case of Dunnagan v. Lackey (Tex. Civ. App.) 283 S. W. 927, the question of sufficiency of the evidence to support a verdict was presented. The court thus stated the case and thus ruled:

"Suit was brought by W. M. Lackey against W. J. Dunnagan, administrator of the estate of J. T. Dunnagan, deceased. Witness Williams testified that when he consulted J. T. Dunnagan, the deceased, with reference to installing gas fixtures in his house, that Dunnagan said: 'Well, I would love to have the gas, but you will have to see Mr. Lackey; he is the man who will have to put it in because this property will some day belong to him. I have made arrangements with Mr. Lackey and his good wife to take care of me, because I am an old man and am not able to take care of myself, and I have no one else in the house with me.' Discussing the sufficiency of the above testimony the court said: 'This testimony is admissible, and is sufficient to sustain the verdict and judgment upon the theory that the appellees were there under some kind of an arrangement with the deceased, in virtue of which he expected to compensate them.' "

In the case of Taylor v. Hudson, 145 Mo. App. 377, 129 S. W. 261, the plaintiff was a niece of Mrs. Kerby. John R. Kerby was Mrs. Kerby's husband and they had no children. When the plaintiff was 16 years of age she was requested by the Kerbys to come and live with them, which she did, going to school for approximately 2 years, and at the end of which time she expressed her intention of returning home, but was prevailed upon to remain longer, with the understanding that she would be clothed and furnished a piano with musical instructions. During Mr. Kerby's life he paid for her clothing and bought her a piano. After he died she expressed her intention of returning home, but at the solicitation of Mrs. Kerby continued to be with her and cared for her until her death, for a period of 10 years. During this time she did the housework for Mrs. Kerby, and worked for a short time for a printing office and store and in making collections for the telephone company, to earn money to buy herself some clothes. The court, in discussing the sufficiency of the evidence to support the plaintiff's claim, said:

"It was shown that Mrs. Kerby said that she had always told plaintiff that she would be amply provided for; that she was not able to care for herself and could not get along without her; that nobody would do anything for her, and when plaintiff went to her own home she would request her by telephone to come back, that she could not do without her; that she intended to compensate her by her will; and that she intended to leave all her property to her at her death. The statement of Mrs. Kerby and the conduct of the parties were sufficient to show an implied contract that plaintiff was to receive pay for her services. The evidence of such a contract may be proved by circumstances [citing authorities]. But if Mrs. Kerby promised to compensate plaintiff for her service, which the evidence tends to prove, the promise was sufficient to support an action for a specific performance [citing authorities]. And she has also her remedy at law for the value of said services" [citing authorities].

In the case of Signaigo v. Signaigo (Mo. Sup.) 205 S. W. 23, a Miss Amrein asserted an agreement on the part of David Signaigo and his wife to will to her all their property at their death. The facts show that when Miss Amrein was 14 years of age she went to live with Signaigo and his wife in June, 1899. She lived with them until the death of Mrs. Signaigo in 1909, doing the housework and assuming the rôle of a child, going to school and taking music, etc. Shortly after the death of Mrs. Signaigo, in October, 1909, David Signaigo died, leaving a will of his property to his wife, but, she having died prior to his death, he therefore practically died intestate. The facts show that the Signaigos loved Miss Amrein and had stated on several occasions that she would some time have all they had. In discussing the sufficiency of the evidence, the court said:

"The parol agreement relied upon by respondent has been completely performed, so that the deceased, in his lifetime, received and enjoyed all the benefits for which it was given. His death made it impossible that he should perform it by devise or otherwise. In such case equity can and will, under proper presentation of the facts, and upon the proper presentation of the facts, charge the land with a trust in favor of the one who has paid the consideration and will execute the trust by decreeing the legal title in accordance with the statute of uses. This case has its foundation in this jurisdiction, and, if the facts justify it, calls for this remedy. The substantial averments in the pleading by which respondent's case is presented are that, in consideration that she should enter the family of Mr. and Mrs. Signaigo as their child, and should, in such capacity, continue a member of their household until their death, she should have their property upon the occurrence of that event. This, on their part, was the expression of a very natural and very human desire, founded in a sentiment which we all recognize as a worthy impulse of our kind. They were childless, and that they shrank from encountering that period in their lives which calls as earnestly for affectionate care as did their first childhood, without some one in their household akin in blood and bound with them in ties of common interest and vicissitude. That they should have felt more confidence in such an arrangement than in the service of hirelings is neither strange nor unworthy, even in the estimation of courts. It is admitted that they gained what they are alleged to have greatly desired, and the issue in this suit has to do only with the terms upon which they attained it. * * * The obligation to leave the property to respondent by one or the other is well pleaded, and performance by respondent is not denied, so that it only remains to prove the contract as laid. * * * As we have stated in a preceding paragraph, there would be nothing unnatural, unworthy, ungrateful, or even ungenerous in a desire, on the part of the Signaigos, to make this contract. There is nothing which indicates any duty on the part of Mr. Signaigo toward any relative by consanguinity superior to or inconsistent with such a desire toward the relative of his wife. The claim of the appellants is founded solely upon a law disposing of his estate in the event only that he should die without having lawfully made any other disposition. In making this arrangement both he and his wife enjoyed the most perfect liberty to consider their own comfort and pleasure. It is natural that they should have become attached to respondent. The families were not only neighborly, but intimate. Respondent was taken into their family, and lived with them 10 years. That she was obedient and affectionate and that they came to love her, we will assume, for the evidence is ample and undisputed that during all that time they continued to stand in the relation of parents to her, furnishing her food, clothing, education, and medical attendance, and fulfilling in fact all those offices by which parents nurture their children and prepare them for the duties and responsibilities of life, without any interference or aid on the part of the natural parents. * * * That she was nearer to him in association and affection than any of his blood relatives, and he desired her to be a member of his family, is evident; and it is not strange that he should have preferred that the modest fortune he had accumulated should remain intact in her hands rather than be scattered among his own relatives."

For other cases relating to the subject, see Sharkey v. McDermott, 91 Mo. 647, 4 S. W. 107, 60 Am. Rep. 270; Cubit v. Jackson, (Tex. Civ. App.) 194 S. W. 594; Jordan v. Abney, 97 Tex. 296, 78 S. W. 487; Starnes v. Hatcher, 121 Tenn. 330, 117 S. W. 219; Alexander v. Alexander, 150 Mo. 579, 52 S. W. 256; City of Houston v. Ritchie (Tex. Civ. App.) 191 S. W. 362.

[4-6] We should also call attention to the evidence tending to show at least a gift of the real property involved in controversy. The undisputed evidence shows that the plaintiffs moved into the home place and that Marshall Jennings lived there with them, frequently taking his meals with them, and that they looked after him and kept up the property, making fences and other improve-

ments detailed in the testimony, including the erection of a permanent structure of the value of $500. Marshall Jennings, prior to his death, had stated to one of the witnesses, in substance, that in consideration of what the plaintiff Lillian Burroughs had done in taking care of his mother for 7 years and in taking care of him, if he ever needed taking care of, the property was all hers after his death. As to this feature of the case, the appellee by the adoption of the answer of a codefendant pleaded the statute of frauds and insists that the evidence fails to show a delivery of possession of the real property. It is well settled in our law that the title to real property will pass by a parol contract or gift upon delivery of possession, followed by valuable improvements in good faith. It is essential, as appellee insists, that possession must be delivered to the person claiming under this exception to the statute of frauds. But we do not think that in this case the mere fact that Marshall Jennings lived together with the plaintiffs, as a matter of law, disproves the essential fact. The evidence at least tends to show that he merely reserved a room upon the premises and committed to the plaintiffs the duty of making repairs, improvements, etc. And we think this issue, as well as others, was for the jury's determination.

In the case of Freeman v. Jones, 43 Tex. Civ. App. 332, 94 S. W. 1072, the court held:

"The undertaking of Jones to keep the taxes paid, the premises in repair, and to supply the needs of deceased during her life was one which might have become very onerous had she lived to a great age, and one which might have easily equaled the value of the property had she lived out her reasonable expectancy. That such an undertaking is sufficient consideration for such a deed is a proposition well sustained by authority [citing cases]. The transaction, being affirmatively shown to be fair and free from improper influences, should be upheld."

Other questions are presented, such as that the answer of appellee administrator fails to present an affirmative defense, etc., but these questions, we think, need not be discussed. A careful consideration of the authorities cited and of the evidence detailed had led us to the conclusion that the court erred in giving the peremptory instruction. The contention in behalf of appellee that the evidence shows that Lillian Burroughs' residence with and services for Marshall Jennings and his mother was the consideration given for her board, clothing, etc., furnished by them, in so far as the evidence gives color to this contention, was for the jury's consideration and determination. We conclude that the court erred in giving the peremptory instruction.

The judgment will be accordingly reversed and the cause remanded.